UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BROADWAY PINE BRANDS LLC,<br><br>                         Plaintiff,<br>vs.<br><br>SHIRO HOUSE, *et al.*,<br><br>                         Defendants. | Civil Action No. 2:21-cv-406<br><br>Jury Trial Requested<br><br>**FILED UNDER SEAL** |

**DECLARATION OF NATE JELOVICH
IN SUPPORT OF PLAINTIFF'S *EX PARTE* APPLICATION
FOR ENTRY OF A TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

I, **NATE JELOVICH**, do hereby declare:

1. I am over eighteen (18) years of age. I have never been convicted of a felony or any criminal offense involving moral turpitude, and I am fully competent to testify to the matters stated herein. I have personal knowledge of every statement made in this Declaration and such statements are true and correct.

2. I am an executive of the Plaintiff company, Broadway Pine Brands LLC, a Delaware limited liability with a registered address of 8 the Green, Ste R, Dover, Delaware 19901and the 100% owner of all the assets of Heart to Heart Gifts, Inc., the original company that developed and marketed the product at issue in this case (i.e., the Daisy Pillow).

3. I make this declaration in support of Plaintiff's *Ex Parte* Application for Entry of a Temporary Restraining Order and Preliminary Injunction against Defendants, the Individuals, Partnerships, and Unincorporated Associations identified on **Schedule "A"** to the Complaint.

- 1 -

4.      The Defendants use the interactive commercial Internet websites and Internet based e-commerce stores ("Online Marketplace Platforms" or "OMPs") using the seller identities and store names set forth on **Schedule "A"** to the Complaint.

5.      The original designer and creator of the Daisy Pillow, Yi Ping Lai, President of Heart to Heart Gifts, Inc. ("Heart to Heart") began by making handmade pillows, pillow beds, and accessories out her home in 1995. Since then, she created and innovated all of the Heart to Heart Gifts, Inc.'s products and packaging. This is a costly effort involving graphic design, industrial design and tooling. It takes time to create, design, test, redesign and retest prototypes. A lot of money was spent on photography to show how the product works or to highlight the end result. That photography is used on the company's website, Amazon store, sent to customers, and used at tradeshows. Products are introduced to retailers via tradeshows across the country. This introduction process costs a lot of money but it is a chance to show customers the quality and use of the product. Today, the Butterfly Craze Daisy Pillows are a well-known national brand in the gift and houseware industries. It is recognized for its quality, inventions, creative packaging and whimsical designs. Our customers often immediately recognize our new products as being invented and designed by Heart to Heart Gifts. It is for that reason that the Plaintiff acquired Heart to Heart Gifts, including its all of the assets, intellectual property, goodwill and brands. More specifically, Plaintiff acquired and is the current owner of the Butterfly Craze brand Daisy Pillow.

6.      Like the other Heart to Heart Gifts products, Plaintiff's product branded the BUTTERFLY CRAZE® Daisy Pillow ("Plaintiff's Product") was conceived by Yi Ping Lai, the former owner of Heart to Heart Gifts.

7. Plaintiff's Product has been featured and reviewed in online videos, articles, or podcasts.

8. Genuine goods bearing at least one of Plaintiff's Mark (as defined below) or using Plaintiff's Works, are widely legitimately advertised and promoted by Plaintiff, its authorized distributors, and unrelated third parties via the Internet. Over the past several years, visibility on the Internet, particularly via Internet search engines such as Google, Yahoo!, and Bing, has become increasingly important to Plaintiff's overall marketing.

9. Thus, Plaintiff and its authorized distributors expend significant monetary resources on Internet marketing, including search engine optimization ("SEO") strategies. Other costs include print catalog ads, tradeshows, and handing out free samples. Those strategies allow Plaintiff and its authorized retailers to fairly and legitimately educate consumers about the value associated with Plaintiff's brand and the goods sold thereunder. Similarly, Defendants' individual seller's stores are indexed on search engines and compete directly with Plaintiff for space in the search results.

10. Additionally, Plaintiff has taken numerous steps to protect Plaintiff's Product. For instance, Plaintiff is the owner of U.S. Reg. No. 3528611, BUTTERFLY CRAZE® for "on-line retail store services featuring decorative products, costumes, toys, gifts and fashion accessories; Wholesale stores featuring decorative products, costumes, toys, gifts and fashion accessories." in international class 35. A copy of the registration certificate attached to the Complaint as **Exhibit 3**.

11. Below are images of one of Plaintiff's Products, which retails for between from $31.99 (medium) - $49.99 (large).

 

12. Plaintiff is also the owner of various published photographs, videos, artwork, creative text and product instructions appearing on its web site butterflycraze.com. ("Plaintiff's Works"). Screen shots of the Plaintiff's Mark, Website, Amazon Store, and Works are shown in **Complaint Exhibit 2.**

13. The unique features of Plaintiff's Product, Plaintiff's Mark and Plaintiff's Works, including, the distinct photographs, the design, the instructions, the packaging, and the unique presentation of the product, all comprise Plaintiff's valuable intellectual property ("IP") and all have become distinct in consumer's minds such that consumers associate all of this IP with Plaintiff's Product.

14. Plaintiff's Mark and Plaintiff's Works have been used in interstate commerce to identify and distinguish Plaintiff's goods. Plaintiff's Mark and Works have been used by Plaintiff prior in time to Defendants' use of the Mark and Works. Plaintiff's Mark and Works have never been assigned or licensed to any of the Defendants in this matter. The Plaintiff's Mark is a symbol of Plaintiff's quality, reputation, and goodwill and have never been abandoned.

15. Due to the success of Plaintiff's Product, Plaintiffs have become the target of multiple infringers seeking to profit off the goodwill and reputation and fame enjoyed by Plaintiff's Mark and Works and Plaintiff's Product.

16. Plaintiffs have been forced to police the various Internet marketplaces to identify and seek takedowns of unlawful listings for the Infringing Products[1] since allowing the unlawful listings to continue is causing damage to Plaintiff's reputation and bottom line. Some Defendants sell their products at a fraction of the controlled retail price. Because of the software provided by the various Internet Marketplaces, the lowest priced items are sorted to the top and/or promoted by the software and then purchased by the consumers. Plaintiff's Product is thus ignored. Plaintiffs have had varied success in identifying and requesting takedowns of the various unlawful listings and as soon as one is taken down another unlawful listing replaces it. Another major problem with the Internet Marketplaces is that there is a direct and convenient connection between various Chinese and other unidentified manufactures to the Infringing Products. In essence, a counterfeiter in Vietnam or Russia, for example, may order a crate of Knock-Offs from a Chinese manufacturer, have them drop shipped to a fulfillment center in the United States, and then sell the Knock-Offs to a US consumer through a Third Party Service Provider. The ease of this system encourages knock-offs to flourish.

17. For these reasons, Plaintiff retained the legal counsel of Ference & Associates LLC ("the Ference firm") to perform the policing of various Internet marketplaces. During the process, the Ference firm identified many Chinese manufacturers operating on Marketplace

---

[1] As set forth in the Complaint, Defendants (i) using Plaintiff's photographs, while promoting, selling, offering for sale and distributing knock-offs of Plaintiff's Product, thus unfairly competing, and/or (ii) using Plaintiff's federally registered trademark BUTTERFLY CRAZE®, while offering to sell and selling knock-offs of Plaintiff's Product, thus counterfeiting. To be clear, whether the products infringe or unfairly compete, they are identified as Knock-Offs in these papers.

Storefronts hosted by the Internet marketplaces. These manufacturers were supplying many of the other identified Defendants with Knock-Offs flooding the Internet marketplaces and damaging Plaintiff's business. This damage to Plaintiff's business will continue unless Plaintiffs receive the requested restraining order and injunctive relief.

18.     Defendants' sale, distribution, and advertising of the Knock-Off Product are highly likely to cause consumers to believe that Defendants are offering genuine versions of Plaintiff's Products when in fact they are not. To illustrate, below are several examples which vividly show the Knock-Off Product itself and the manner in which it is marketed is designed to confuse and mislead consumers into believing that they are purchasing Plaintiff's Product or that the Knock-Off Product is otherwise approved by or sourced from Plaintiffs:

Plaintiff's Photographs











Additional photograph comparisons of Plaintiff's Product and the Knock-Offs appear in **Complaint Exhibit 1**.

*19.*    Defendants' actions have resulted in actual confusion in the marketplace between Defendants' Knock-Off Product and the genuine version of Plaintiff's Products. Numerous purchasers of Defendants' Knock-Off Product have written on-line reviews to complain about the quality of the Knock-Off Product believing same to be a genuine version of Plaintiff's Product. Below are excerpts from some of these on-line reviews:

*"I didn't like the quality"*

*"I don't know if I got a defective one. But it like falls apart constantly. I am constantly having to patch it up because seams keep coming apart. This has been going on since I first got it and I have gotten so fed up I had to come on here in case others ordered it and theirs is doing the same. It isn't a cheap pillow and should hold up better. I have a daughter who is very gentle with her toys so she isn't throwing it about or anything. She can simply sit on it and a seam busts. So frustrating"*

*"Please do not waste your money. It is horribly uncomfortable. My child won't use it. It is about the same as just sitting on the floor. Very overpriced and useless "seating cushion". We will probably keep this thing for a few days."*

20.    As poorly designed and manufactured products that are knock-offs of Plaintiff's Product, the Knock-Offs are eroding the value of Plaintiff's brand.

21.    The Knock-Offs threaten to destroy the reputation of high quality that Plaintiff's Products have earned.

22.    Defendants do not have, nor have they ever had, the right or authority to use Plaintiff's Mark or Works, for any purpose. Defendants' unlawful activities have deprived and continue to deprive Plaintiffs of their rights to fair competition.  By their activities, Defendants are defrauding Plaintiffs and the consuming public for Defendants' benefit.  Defendants should not be permitted to continue their unlawful activities, which are causing Plaintiffs ongoing irreparable harm.  Accordingly, Plaintiffs are seeking entry of a temporary restraining order

prohibiting Defendants' further wrongful unfair competition and infringement using Plaintiff's Mark or Works.

23. Given Defendants' copying and use of Plaintiff's Mark, and/or Plaintiff's Works, the Knock-Offs are indistinguishable to consumers, both at the point of sale and post-sale. By using Plaintiff's intellectual property, Defendants have created a false association between their Infringing Products, their Internet e-commerce stores, and Plaintiffs. Such false association is in violation of 15 US.C. § 1125(a), constitutes unfair competition, infringes on Plaintiff's Mark, and is causing and will continue to cause Plaintiff's irreparable harm and damage.

24. The infringements of Plaintiff's Works deprive Plaintiff of the ability to control the creative content protected by the copyright, it devalues the Plaintiff's brand by associating it with inferior quality goods, and it undermines the value of the Plaintiff's IP by creating the impression that infringement may be undertaken with impunity which threatens Plaintiff's ability to attract investors and markets for the Plaintiff's Products.

25. I have reviewed **Composite Exhibit 1** and the pictured web listings and upon my information and belief, the Defendants identified in **Schedule "A"** of the Complaint, were and/or are currently manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and or/selling non genuine, versions of Plaintiff's Product and copying and using Plaintiff's Mark and/or Plaintiff's Works, or using substantially similar copies of Plaintiff's Works, with the non-genuine, copies of Plaintiff's Product directed to U.S. consumers, including those consumers in Pennsylvania, through their e-commerce stores.

26. None of the identified Defendants are authorized re-sellers of genuine version of Plaintiff's Product. Moreover, none of the identified Defendants are authorized to manufacture, import, export, advertise, offer for sale or sell Plaintiff's Products. Further, Plaintiffs never

consented or granted permission to any of the identified Defendants to use Plaintiff's Mark or Works.

27.  I have confirmed that all of the identified products pictured in **Composite Exhibit 1** are infringements of Plaintiff's Product and upon information and belief, the Defendants set forth in **Schedule "A" of the Complaint** were and/or are currently manufacturing, importing, exporting, advertising, marketing, promoting, distributing, displaying, offering for sale and/or selling patent infringing and unfairly competing products with the Plaintiff's Mark and/or using Plaintiff's Works, or substantially similar copies of Plaintiff's Works, to sell to U.S. consumers, including those consumers in Pennsylvania, through their Online Marketplace Storefronts. Through visual inspection of Defendants' listings for Infringing Products, it was confirmed that each Defendant is featuring, displaying, and/or using at least one of Plaintiff's Mark and/or Works without authorization and that the products that each Defendant is offering infringing versions of the Plaintiff's Product.  The checkout pages or order forms for the Knock-Offs confirm that each Defendant was and/or is still currently offering for sale and/or selling Knock-Offs through their respective Merchant Storefronts and User Accounts and that each Defendant provides shipping and/or has actually shipped Knock-Offs to the United States, including to customers located in Pennsylvania.  At checkout, a shipping address located in the Pittsburgh area ("the Pennsylvania Address") in the Western District of Pennsylvania verified that each Defendant provides shipping to the Pennsylvania Address. I inspected the detailed web listings describing the Knock-Offs Defendants are offering for sale through the Internet based e-commerce stores operating under each of their respective Seller IDs, and determined the products were not genuine versions of Plaintiff's Products.

28. Defendants' actions have caused and will continue to cause, in the event the requested relief is not granted, irreparable harm to Plaintiff's goodwill and reputation as well as to the unassuming consumers who will continue to believe that the Defendants' cheaply produced, inferior, and typically faulty Knock-Offs and knock-offs are produced, authorized, approved, endorsed or licensed by Plaintiffs, when they are not.

29. Defendants' intentional and illegal conduct, including offering for sale and selling inferior infringing and knock-offs into the U.S. and the Commonwealth of Pennsylvania has caused lost profits to Plaintiffs and damaged the inherent value of Plaintiff's business and the Plaintiff's Mark, and, by diluting the brand and goodwill, damaging Plaintiff's reputation for providing high quality products, and interfering with Plaintiff's relationships with its customers and authorized resellers, as well as impeding Plaintiff's ability to attract new customers and business.

30. All of the injuries and damages described above are taking place in the United States, including in Pittsburgh, Allegheny County, Pennsylvania.

31. In addition to trying to stop the injuries and damages caused to Plaintiff's business, Plaintiffs are also seeking in this lawsuit to protect consumers from being exposed to and purchasing the substandard, faulty, and potentially dangerous knock-offs and Knock-Offs that wrongly indicate their origin as being from Plaintiffs or wrongfully use of Plaintiff's Mark and/or Works.

32. I have worked with Plaintiff's legal counsel in this case to assist them in identifying knock-off products and have provided them with various leads in order to find the various outlets for the infringing and knock-off products. If called upon by the Court, Plaintiff's legal counsel is able to explain additional differences between the genuine version of Plaintiff's

- 12 -

Product and the knock-off products and unfairly competing products offered by the identified Defendants.

33. To be sure that none of the Defendants receive advance notice of the relief and remedies requested in Plaintiff's Complaint, or the *Ex Parte* Application for Entry of a Temporary Restraining Order and Preliminary Injunction in this case, neither I nor anybody else at Broadway Pine Brands have publicized the filing of this lawsuit.

I declare under penalty of perjury that the foregoing is true and correct.

*Dated: March 29, 2021*

Seattle, Washington

      / NATE JELOVICH /
      **NATE JELOVICH**